Thomas P. McMahon *v.* Yazoo Delta Lumber Company.[2]

[43 South., 957; 46 South., 57.]

1. STATUTE OF LIMITATIONS.  *Code* 1892, § 2730.  *Adverse possession.*

The facts relied upon to establish a defense predicated of adverse possession of land must be as distinct as the character of the land reasonably admits of, and must be exercised with sufficient continuity to acquaint the owner, should he visit the land, that a claim of ownership adverse to his title is being asserted.

2. EQUITY.  *Quieting titles to land.  Taxation.  Taxes paid.  Code* 1880, § 536.  *Accounting.  What claims for taxes allowable, what not. Rents.*

Upon rendering a decree in complainant's favor quieting his title to lands and cancelling defendant's claims under tax titles:

(a) It was proper to allow defendant the sum paid by him as purchaser at a tax collector's sale, with twenty-five per centum dam-

ages and ten per centum per annum interest thereon, the land being taxable at the time of the sale, as provided Code 1880, § 536, making the purchase money with such damages and interest a lien on the land; but

(*b*) On land not taxable at the time of a pretended sale to the state, it was proper to disallow defendant money paid the state to redeem therefrom and allow him only the amount of taxes paid on the land after it became taxable with six per centum interest per annum thereon; and

(*c*) It was improper not to divide equally between the parties the costs and expenses of an accounting, there being charges against both; and

.(*d*) It was improper to disallow complainant a well proved claim for the rent of a part of the land.

FROM the chancery court of Sunflower county.

HON. PERCY BELL, Chancellor.

The Yazoo Delta Lumber Company, appellee, was complainant in the court below; McMahon, appellant, was defendant there. The court below rendered a·final decree in complainant's favor, from which the first appeal in the case was prosecuted to the supreme court, without waiting for the accounting. This appeal is covered by the first opinion of the court, *post* page 462.

The object of the suit was to remove clouds from the title to land, to obtain possession of the land and for the recovery of rents. The defendant claimed a part of the land under a tax sale based on an assessment made under Laws 1888, p. 24, commonly known as the Madison Act, heretofore decided to be unconstitutional, *Mangum* v. *Hawkins,* 78 Miss., 97, 28 South., 872, and defended on the three years' statute of limitations applicable to tax titles and also on the general ten year statute of limitations.

The decree of the chancery court having been affirmed, on first opinion, the cause was remanded that the accounting might be had. After the remand of the case to the chancery court steps were taken to perfect the accounting and the master reported that defendant owed complainant rent for the three

years 1905, 1906, and 1907, amounting to $1,500, but declined
to allow rent for the previous years; that defendant also owed
complainant for 4,500 feet of gum lumber, worth $378, mak-
ing a total due complainant, $1,878.   The master also reported
that defendant had made improvements upon the lands in con-
troversy amounting to $1,847.50, and had paid taxes amount-
ing to $266.15; interest at 6 per cent. on the amount paid for
taxes, $122.05; clearing 133 acres of land, $1,995—making a
total due defendant of $4,230.70, thus leaving a balance due
the defendant of $2,352.70.   The master omitted to credit de-
fendant with the amount of taxes paid for lot 5 in the pur-
chase from the auditor March 10, 1890, amounting to $31.50,
and also omitted the amount paid as taxes at the sheriff's sale
of lots 4, 10, and 11, March 7, 1892, amounting to $9.25—
these amounts being omitted by instruction of the court because
not liens on the lands in controversy.   The defendant excepted
to the master's report for the following reasons: Because the
master did not allow defendant the amount of taxes paid by
him in redeeming lot 5 and purchasing at the sheriff's sale
lots 4, 10, and 11, and for allowing only six per centum inter-
est on taxes, instead of ten per centum, and for only allowing
$15 per acre clearing the land, instead of $35 per acre, as
claimed by defendant.   The complainant excepted to the re-
port, because it fails to allow rent for the year 1904, and be-
cause it does not show the value of the 50,000 feet of oak tim-
ber consumed by defendant, and in allowing taxes for more
than six years next before the filing of the bill of complaint,
and excepted to the values placed upon the improvements as
being larger than the proof warranted.   The court disallowed
all exceptions and confirmed the finding of the master and the
defendant appealed to the supreme court, the complainant
prosecuting a cross-appeal.

*William Griffin, Mayes & Longstreet* and *Baker & Moody,*
for appellant.

*Johnson & Neill, Alexander & Alexander* and *T. C. Kimbrough,* for appellee.

Argued orally by *Edward Mayes,* for appellant and by *C. H. Alexander* and *T. C. Kimbrough,* for appellee.

OPINION ON FIRST APPEAL.

WHITFIELD, C. J., delivered the opinion of the court.

The opinion of this court in the case of *Kennedy* v. *Saunders,* 90 Miss., 524, s. c., 43 South., 913, is decisive of the controversy before us in the case at bar. We refer to the reasoning in that opinion as conclusive of all the legal questions presented by this case.

The only question calling for any serious consideration in this cause is whether such adverse possession of lot No. 4 is shown as meets the requirements of the ten-year statute. The only two witnesses introduced on this subject who have any personal knowledge of it at all are J. H. Jones and J. W. Byrd. The testimony of Bowen shows that his only knowledge on the subject was obtained by hearsay. The testimony of Jones is that he, some time (to the best of his memory) in 1894, got a contract for the sale of this lot from Burroughs, which he afterwards transferred to one Furr; that in 1894 he thinks it was, he cleared most of lot 4 and put it in cultivation. He admits that his memory was very poor, especially as to dates, and that he had not seen the contract, that showed the date when he took possession, as he said, of lot 4, for about four years. That he is clearly wrong about putting the most of lot 4 in cultivation is demonstrated by the fact that the lot contained thirty-three acres, and it is plainly shown that no more than six or eight acres were ever deadened or cultivated by anybody until 1898 and thereafter. This same witness admits, later on in his testimony, that Furr never cultivated but about eight acres, which, he says in another place, was more than he had cul-

tivated.    He built no house on it, but claimed that he fenced it.
The claim that he fenced it is afterwards shown to have been a
mistake by the testimony of Byrd.    The only fence, appar-
ently ever put around it, was a one-wire fence, which Gorman,
who owned the lot just north of lot 4 ran down in a V-shape
to include four or five acres of lot 4, supposing it doubtless, to be
part of his land.    The testimony of Jones further shows that
the deadening which he did was wholly irregular, sometimes a
month apart, and that he never lived on the land at any time,
and that the only thing which led him to believe that the date
of his entry must have been 1894 was his recollection that that
was the date of the contract, which he had not seen within four
years before the taking of his testimony.    It may be said gen-
erally, as to the testimony of Jones, that it is entirely too
vague, uncertain, and unsatisfactory to uphold adverse posses-
sion.    The testimony of the other witness, introduced also by
the appellant, J. W. Byrd, is very satisfactory and very clear.
It shows, beyond any controversy, that Jones was mistaken as
to when he entered and as to what he did.    Byrd shows in va-
rious parts of his testimony as follows: That he took possession
of these lots in February, 1903, and that at that time there were
only five acres of lot 4 in cultivation, and they not thoroughly,
but partially cultivated; that lot 4 appeared to have been cul-
tivated about two years before that—that is to say, the land
had just been broken up and looked like it had been in culti-
vation about two years; and that it looked like it had been
cleared up about two years, judging from the appearance of it.
This would show that the clearing of the land had occurred
about 1900; but this is not all.    Byrd further testifies that,
when he went there in 1903, there was no house on lot No. 4;
that there were only five acres of it that had ever been cleared or
cultivated at all; and that those five acres looked like they had
been recently cleared, and the land was in a rough state of cul-
tivation.    He further says, in answer to a question whether he
found any fence on lot 4 in 1903, as follows: "I found a little

wire, about one row of wire, on lot 4; just the five acres circled around joined to the field of Gorman. Gorman's field embraced the land north of lot 4. He had the land north of lot 4. This little corner of the northeast corner of lot 4 was in cultivation. It was fenced in with the land north of the field I understood belonged to Gorman. Gorman's field might have had 100 acres or more in it. The fence that ran into lot 4 was in a V-shape, and took in the northeast corner of lot 4, and this is all that there was of lot 4 that was under fence or cultivated." This clears up the matter significantly. Gorman, evidently supposing this little V-shaped tract of four or five acres to be part of his one hundred acres, had run his fence around it and cleared it up.

There is no reconciling the testimony of Byrd and Jones. The chancellor had the witnesses before him, saw their manner on the stand, and manifestly accepted Byrd's statement as clear and satisfactory, rejecting Jones' testimony as too vague and uncertain as to its statements as to possession. Gorman's fence was shown by Byrd's testimony to have been moved back later about a rod to conform to the true boundary, and Gorman had only been cultivating this strip of four or five acres some two or three years, as Byrd says, and, of course, claiming it as his own. Finding out his mistake, he moved his fence to run according to his own boundary. There is absolutely nothing in this testimony to make out any adverse possession of lot 4, within the meaning of the law of adverse possession. The facts of this case fall far short of the facts in the case of *McCaughn* v. *Young,* 85 Miss., 277, 37 South., 839, and the expression in *Jones* v. *Rogers,* 85 Miss., 802, 38 South., 742, relied on, has been overruled in *Kennedy* v. *Saunders, supra,* the true doctrine is announced in 1 Cyc., p. 984, as follows: "The only rule of general applicability is that the facts relied upon to establish adverse possession must always be as distinct as the character of the land reasonably admits of, and must be exercised with sufficient continuity to acquaint the owner,

should he visit the land, with the fact that a claim of ownership adverse to his title is being asserted. Trivial and disconnected facts, doubtful and equivocal in their character and which do not clearly indicate the intention with which they are performed, cannot be regarded as amounting to possession; otherwise, a man might be disseised without his knowledge, and the statutes of limitation might run against him while he had no ground to believe that his seisin had been interrupted." See, as fully discussing this subject, *Kennedy* v. *Saunders, supra.*

It is to be specially observed that the lands in this case are not wild swamp lands, insusceptible of possession, but are plainly lands which have been reduced to actual occupation and tillage since 1897, and not within the range of the observations made in *McCaughn* v. *Young.* But, more than this, it is distinctly shown in the testimony of Randle that Burroughs never claimed to own the land adversely to him. Randle says: "N. T. Burroughs and his son, Roy C. Burroughs, made every effort to secure a quitclaim from us for these land. A couple of years ago Mr. N. T. Burrougs came to Washington and made me a proposition in the presence of a witness, a resident of Washington, to purchase, and submitted me a quitclaim to sign. The same was filled out in his own handwriting; but, when I declined to make the quitclaim, he begged to have the quitclaim returned to him. I did so after having the same copied and verified. His son, Roy C. Burroughs, wrote me a number of letters, and agreed at one time to buy all our lands in Sunflower county. Mr. Roy C. Burroughs came from Chicago to Philadelphia to see me, to get a quitclaim to this property, and at a subsequent date he came to Washington to secure the quitclaim." He was asked the direct question whether he did not know that N. T. Burroughs and his vendees claimed title to this property as owners thereof, and his answer was: "N. T. Burroughs, I understand, purchased this land at an illegal tax sale the year men-

tioned in question No. 11, but I did not know that either of them claimed adverse title to this property, as they persisted in their efforts to purchase from us." This is the whole testimony in this record shedding any light upon the question as to whether the appellants ever had continuous, uninterrupted, adverse possession of lot 4 within the meaning of the law. The chancellor passed on the testimony of these three witnesses in reference to this, the only disputed point in the testimony. His finding of the fact must stand, unless we can say that it is manifestly wrong; and that we cannot say on this record.

The opinion delivered in the case of *Eastland* v. *Yazoo Delta Lumber Co.,* 90 Miss., 330, s. c., 43 South., 956, controls this case so far as the assessment under the Madison act and the inapplicability of any of the statutes of limitation to a sale made under that assessment are concerned, and we refer to that opinion on these points.

Wherefore the decree is affirmed, and the cause remanded for an accounting.

*Affirmed.*

OPINION ON SECOND APPEAL.

Whitfield, C. J., delivered the opinion of the court.

This case was here once before, and the rights of the parties settled in that decree as to title, and the cause remanded for an accounting as to rents, improvements, etc. The master made a report, which was excepted to by both parties, but which was confirmed by the chancellor, all exceptions being disallowed, and both an appeal and a cross-appeal have been prosecuted from this decree.

The appellant assigns several errors on the direct appeal. It is obvious that the state never had any title to lot 5, section 31, township 20, range 3 W., under the sale made in 1881. The land was not liable then to taxation. The facts about this lot 5 are these: Lot 5 was sold to the state for taxes in 1881. At

that time said land was not liable to taxation, having never been in private ownership. On March 7, 1890, nevertheless, the state undertook to convey the title so alleged to have been so vested in it by said tax sale in 1881 to one Easterling, who conveyed it to appellant, and Easterling and appellant have paid taxes on said land until the institution of this suit. Appellant insists that he should be allowed the cost of redeeming lot 5, with the taxes paid thereon, with ten per cent. interest on the amount of said taxes since the redemption of said land on March 5, 1890, notwithstanding the fact that the title was in the state when the tax sale occurred. The chancellor refused to allow the cost of redeeming lot 5 from the state, amounting to $21.52, and interest at ten per cent. on the taxes paid since the alleged purchase from the state, but did allow said taxes and six per cent. interest on the taxes paid on said lot 5. We think this action was correct. These people did not buy at the tax sale, and they got nothing by their alleged deed from the state. They were entitled to nothing, except what they got, as against this appellee.

The chancellor also refused to allow appellant the amount paid to the tax collector for purchase money of lots 4, 10, and 11, and damages and interest on the taxes paid at ten per cent. per annum, but did allow said taxes, with interest at six per cent. The facts as to these three lots are these: That on March 7, 1892, the tax collector of Sunflower county conveyed to Burroughs these three lots; appellant deraigning title under Burroughs. We think it is clear, under section 536, of the Code of 1880 as interpreted in *Cogburn* v. *Hunt*, 57 Miss., 682, and *Mayer* v. *Peebles*, 58 Miss., 628, that the chancellor erred in not allowing the appellant the amount paid to the tax collector for the purchase money on the tax sale of these three lots, 4, 10, and 11, together with damages and interest on the taxes paid according to the statute.

We think the chancellor also erred in not dividing the costs attending the matter of the master's accounting, and the ex-

penses incident thereto on the decree thereon equally between the parties. For the two errors indicated, the cause is reversed on the direct appeal, and remanded, with instructions to conform the decree below to the opinion hereinabove on the direct appeal.

On cross-appeal we think the chancellor erred in not allowing cross-appellant rent for the twenty-five acres of land cultivated by Byrd in the year 1904. The testimony clearly shows that the rent of these twenty-five acres for 1904 was worth $6 an acre, $150 in all. This amount seems to have been arbitrarily rejected, so far as we can discover, and should clearly have been allowed. We do not think any other error assigned on the cross-appeal is maintainable on the proof in the record.

For this error we reverse the decree on cross-appeal below, and remand the cause, with directions to allow this item of $150.

*Reversed.*